IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| TOKIO MARINE & NICHIDO FIRE INSURANCE COMPANY, LTD., | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. H-09-886 |
| M/V SOPHIE RICKMERS, her tackle, apparel, etc. *in rem*, and SOPHIE RICKMERS SCHIFFAHRTSGESELLSCHAFT, *in personam*, | § § § § § § | |
| Defendants, | § § | |
| v. | § § | |
| EASTERN CAR LINER, LTD., EASTERN CAR LINER AMERICAS, INC., RICKMERS-LINIE GMBH CIE KG, and RICKMERS-LINIE AMERICA, INC., *in personam*, | § § § § § § | |
| Third Party Defendants. | § | |

MEMORANDUM AND ORDER

Pending are Defendant Eastern Car Liner, Ltd.'s Motion for Partial Summary Judgment and Eastern Car Liner (Americas), Inc.'s Motions for Summary Judgment and Partial Summary Judgment (Document No. 42), and Rickmers-Linie GmbH & Cie KG, Rickmers-Linie (America), Inc., and the Sophie Rickmers' Motion for Partial Summary Judgment (Document No. 43).[1] After carefully considering

---

[1] Rickmers-Linie (America), Inc.'s Motion for Summary Judgment (Document No. 41) is DENIED as MOOT because that party has been dismissed from this case. *See* Document No. 58.

the motions, responses, replies, and the applicable law, the Court concludes for the reasons that follow that both motions should be denied.

## I. Background

This is a maritime cargo loss case arising from the on-deck ocean carriage of forty-eight sections of wind turbine towers aboard the M/V Sophie Rickmers.   In February, 2009, while the M/V Sophie Rickmers was transiting the Pacific Ocean from Pohang, South Korea to Galveston, Texas, twenty of the wind turbine tower sections were lost overboard and five of the remaining sections allegedly suffered physical damage.

Mitsubishi Power Systems, Inc. ("Mitsubishi") acquired the forty-eight tower sections from Dongkuk S&C Co. Ltd. and insured the cargo with Plaintiff Tokio Marine & Nichido Fire Insurance Company ("Tokio Marine").[2]   Mitsubishi and/or its affiliate, Mitsubishi Power Systems Americas, Inc. ("Mitsubishi America") engaged Third Party Defendant Eastern Car Liner, Ltd. ("Eastern"), a Japanese entity with its principal place of business in Tokyo, Japan, to carry the cargo from Pohang, South Korea to Galveston, Texas as the non-vessel operating common carrier, or NVOCC.[3]

_____

[2] See Document No. 43, ex. B (Dongkuk Invoice); *see also* Document No. 48 ¶ 1.

[3] *See* Document No. 42 at 3.  An "NVOCC is defined as 'a common carrier that does not operate the vessels by which the ocean

Eastern subcontracted with Rickmers-Linie GmbH CIE KG ("Rickmers Germany"), a foreign entity with its principal place of business in Hamburg, Germany, to transport the cargo aboard the M/V Sophie Rickmers.[4]

The overall arrangements between Mitsubishi and Eastern for the carriage of the turbine units involved three documents: the "Master Booking Note,"[5] the "Individual Booking Note,"[6] and the "Waybill,"[7] each of which incorporates Eastern's "bill of lading

---

transportation is provided, and is a shipper in its relationship with an ocean common carrier.'" AEL Asia Express (H.K.), Ltd. v. Am. Bankers Ins. Co., 5 F. App'x 106, 109 (4th Cir. 2001) (quoting 46 U.S.C.A. app. § 1702(17)) (emphasis in original). "Courts frequently describe NVOCCs as 'intermediaries between a shipper of goods and an operator of a vessel that carries the goods.'" Id. (quoting Axess Int'l Ltd. v. Intercargo Ins. Co., 183 F.3d 935, 937 (9th Cir. 1999)).

[4] See Document No. 43 at 6.

[5] See Document No. 42, ex. 4A.  The May 10, 2007, Master Booking Note was a two-year contract between Eastern and Mitsubishi America to transport 240 sets per year, or 480 sets total, of wind turbine tower sections from Korea to the United States.  Each set consists of 4 wind turbine sections (bottom, mid low, mid upper, and top), which together comprise a single wind turbine.  There were to be 40 shipments over the two-year Master Booking Note, each shipment containing 48 sections (or 12 complete wind turbines).

[6] See Document No. 42, ex. 4C.  Individual Booking Note No. BN011009, dated January 10, 2009, specified the vessel, the port of loading, port of discharging, freight rate, detention charges, approximate date of shipment and other details for shipment of 12 complete wind turbines (48 turbine sections).  The individual booking note included the following notation on box 21: "Cargo to be stowed on deck with Merchant risk and responsibility." Mitsubishi's agent signed as Merchant.

[7] See Document No. 42, ex. 4B.  The Waybill is a non-negotiable document issued by Eastern to the shipper acknowledging

clauses."[8]   The parties agree that the bill of lading clauses govern the terms of their agreement, but disagree on whether certain clauses are rendered null and void by Japan's 1992 Law of International Carriage of Goods at Sea ("1992 Japan COGSA").[9]

Eastern moves for partial summary judgment, asserting that it is entitled to limit its liability based on the bill of lading clauses.   Tokio Marine, as Mitsubishi's subrogee, contends that 1992 Japan COGSA governs this dispute and that its higher limitation of liability applies.

Rickmers-Linie GmbH & Cie KG and the M/V Sophie Rickmers ("Rickmers Defendants") also move for summary judgment, contending that they are entitled to limit their liability under the Hague Rules based on the Rickmers-Linie GmbH & Cie KG's Bill of Lading ("Rickmers GmbH Bill of Lading").[10]   Tokio Marine argues that the higher limit under the Hague-Visby Rules applies to the cargo, or,

---

receipt on the M/V Sophie Rickmers V-4 on 08 Feb. 2009, at Pohang, Korea, of "48 PCS and 5 Packages," etc., in good order and condition to be carried to Galveston, Texas, USA, subject to the terms and conditions set out in the Waybill.

[8] Eastern publishes its "Bill of Lading Clauses" online. *See* Document No. 42, ex. 4D, *available at* http://www.ecl.co.jp/data/ 07_01e.html (last visited on July 20, 2011).   Each of the three documents between Eastern and Mitsubishi incorporates these clauses by reference.

[9] Law for International Carriage of Goods by Sea (Law No. 172 of 1957; as amended by Law No. 130 of 1971, Law No. 94 of 1975 and Law No. 69 of 1992) [hereinafter "1992 Japan COGSA"].

[10] *See* Document No. 43.

4

if the Hague Rules apply, that Mitsubishi was not given a fair
opportunity to declare a higher value for the goods, and therefore
cannot be subject to the bill of lading's limit of liability.[11]

## II. Summary Judgment Standard

Rule 56(a) provides that summary judgment should be rendered
"if the movant shows that there is no genuine dispute as to any
material fact and the movant is entitled to judgment as a matter of
law." FED. R. CIV. P. 56(a).[12]  Once the movant carries this burden,
the burden shifts to the nonmovant to show that summary judgment
should not be granted.  Morris v. Covan World Wide Moving, Inc.,
144 F.3d 377, 380 (5th Cir. 1998).  A party opposing a properly
supported motion for summary judgment may not rest upon mere
allegations or denials in a pleading, and unsubstantiated
assertions that a fact issue exists will not suffice.  Id.  "[T]he
nonmoving party must set forth specific facts showing the existence
of a 'genuine' issue concerning every essential component of its
case." Id.

In considering a motion for summary judgment, the district
court must view the evidence "through the prism of the substantive

---

[11] See Document No. 60.

[12] As of December 1, 2010, Federal Rule of Civil Procedure 56
has been amended.  Because these motions were filed prior to that
date, the Court will apply the previous version of Rule 56 to these
motions.

evidentiary burden." <u>Anderson v. Liberty Lobby, Inc.</u>, 106 S. Ct. 2505, 2513 (1986). All justifiable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 106 S. Ct. 1348, 1356 (1986). "If the record, viewed in this light, could not lead a rational trier of fact to find" for the nonmovant, then summary judgment is proper. <u>Kelley v. Price-Macemon, Inc.</u>, 992 F.2d 1408, 1413 (5th Cir. 1993). On the other hand, if "the factfinder could reasonably find in [the nonmovant's] favor, then summary judgment is improper." <u>Id.</u> Even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that "the better course would be to proceed to a full trial." <u>Anderson</u>, 106 S. Ct. at 2513.

### III.   <u>Eastern's Motion for Summary Judgment</u>

#### A.   <u>Choice of Law</u>

Eastern and Tokio Marine agree that because Mitsubishi agreed to the cargo being carried on deck, the wind turbine tower sections were not "goods" as defined by the United States Carriage of Goods by Sea Act ("U.S. COGSA"),[13] and that U.S. COGSA therefore is

---

[13] 49 Stat. 1207 (1936), *reprinted in* note following 46 U.S.C. § 30701. COGSA was previously codified in the appendix to Title 46 of the United States Code. When Title 46 was recodified in 2006 by

inapplicable.  The parties further agree that Japanese law applies to the interpretation of the contract of carriage.[14]  Japanese law, in turn, makes 1992 Japan COGSA applicable of its own force to the contract of carriage, because the cargo in this case was "from a loading port or to a discharging port, either of which is located outside Japan."[15]  Unlike U.S. COGSA, 1992 Japan COGSA applies to both on-deck and below-deck cargo.[16]

## B.  Application of Foreign Law in Federal Court

A party who intends to raise an issue about a foreign country's law must give notice by a pleading or other

---

Pub.L. 109-304, Oct. 6, 2006, 120 Stat. 1485, COGSA was not included except as a statutory note to the first section of the Harter Act, 46 U.S.C. § 30701.  *See* David W. Robertson & Michael F. Sturley, *Recent Developments in Admiralty and Maritime Law at the National Level and in the Fifth and Eleventh Circuits*, 32 Tul. Mar. L.J. 493, 500 (2008) (explaining the codification issues).  COGSA was not repealed by the recodification. *See, e.g.*, Ambraco, Inc. v. Bossclip B.V., 570 F.3d 233, 237 (5th Cir. 2009) (applying COGSA).

[14] *See* Eastern Bill of Lading Clause 3 ("The contract evidenced by or contained in this Bill of Lading shall be governed by Japanese laws except as may be otherwise provided for herein . . . .").

[15] *See* Document No. 48, ex. A ¶ 15 (Decl. of Ohki Hirata); *see also* Document No. 48, ex. 12, 1992 Japan COGSA Article 1.

[16] Id.  Eastern's Bill of Lading Clause Paramount recites that the bill is "subject to the provisions of the International Carriage of Goods by Sea Act, 1957 of Japan," which in turn had adopted the Hague Rules for limitation of liability.  Document No. 42, ex. 4D [hereinafter "Eastern Bill of Lading"] at Clause 1.  *See* J.C.B. Sales, Ltd. v. Wallenius Lines, 124 F.3d 132, 136-37 (2d Cir. 1997).  The National Diet of Japan amended its version of COGSA in 1992, replacing the International Carriage of Goods by Sea Act, 1957 of Japan.  *See* Document No. 48, ex. A ¶ 15.

> writing.  In determining foreign law, the court may
> consider any relevant material or source, including
> testimony, whether or not submitted by a party or
> admissible under the Federal Rules of Evidence.  The
> court's determination must be treated as a ruling on a
> question of law.

FED. R. CIV. P. 44.1.  This rule provides courts with broad authority
to conduct their own independent research to determine foreign law
but imposes no duty upon them to do so.  *See* <u>Carey v. Bahama Cruise
Lines</u>, 864 F.2d 201, 205 (1st Cir. 1988)("[Rule] 44.1 empowers a
federal court to determine foreign law on its own, but does not
oblige it to do so."); <u>Bartsch v. Metro-Goldwyn-Mayer, Inc.</u>, 391
F.2d 150, 155 n.3 (2d Cir. 1968) (Friendly, J.) (same).

The parties therefore generally carry both the burden of
raising the issue that foreign law may apply in an action and the
burden of adequately proving foreign law to enable the court to
apply it in a particular case.  *See* <u>Whirlpool Fin. Corp. v. Sevaux</u>,
96 F.3d 216, 221 (7th Cir. 1996) (holding that party waived
conflicts of law issue because it failed to fulfill its obligation
under Rule 44.1 "to provide the district court with 'reasonable
notice' of his intention to raise an issue of foreign law");
RESTATEMENT (SECOND) CONFLICT OF LAWS § 136 cmt. f (1971) ("[T]he party
who claims that the foreign law is different from the local law of
the forum has the burden of establishing the content of the foreign
law.").  Where parties fail to satisfy either burden, the court "is
entitled to look to its own forum's law in order to fill any gaps."

8

<u>Banco de Credito Indus., S.A. v. Tesoreria Gen.</u>, 990 F.2d 827, 836 (5th Cir. 1993); *see also* <u>Carey</u>, 864 F.2d at 205 (applying forum's law where parties fail to raise issue of foreign law's applicability); <u>Commercial Ins. Co. of Newark, N.J. v. Pacific-Peru Constr. Corp.</u>, 558 F.2d 948, 952 (9th Cir. 1977) (same); RESTATEMENT (SECOND) CONFLICT OF LAWS § 136 cmt. h (1971) ("[W]here either no information, or else insufficient information, has been obtained about the foreign law, the forum will usually decide the case in accordance with its own local law except when to do so would not meet the needs of the case or would not be in the interests of justice.").

The parties agree that Japanese law governs, and each has offered affidavits of well-credentialed Japanese attorneys to assist the Court in correctly determining and applying Japanese maritime law to the facts of this case.  Pursuant to Rule 44.1, the Court has considered other relevant materials and sources as well.

C.   <u>Limitations of Liability under 1992 Japan COGSA and Eastern's Bill of Lading</u>

Tokio Marine contends that Eastern's liability is limited by Article 13(1)(2) of 1992 Japan COGSA.  Eastern counters that its liability is limited to the more stingy terms of Eastern's Bill of Lading Clause 14 ("Deck Cargo") (adopting the £100 per package or per unit proviso of Article 4(5) of the Hague Rules), or alternatively, Eastern's Bill of Lading Clause 25 ("Settlement of

9

Claim") (limiting liability to 100,000 Japanese yen per package or
per unit).

When the National Diet of Japan enacted 1992 Japan COGSA, as
a general rule it prohibited as "null and void" the inclusion of
special bill of lading provisions that would limit a carrier's
liability beyond what the 1992 enactment allowed.  Thus, Article 15
of 1992 Japan COGSA, "Prohibition of special agreement," provides:

> (1) Any special agreement which is contrary to the
> provisions of Articles 3 to 5, Article 8, Article 9, or
> Articles 12 to 14 and is not in favor of the shipper,
> receiver, or holder of the bill of lading, shall be null
> and void.  A benefit of insurance in favor of the carrier
> or similar agreement shall also be null and void.

1992 Japan COGSA, Article 15(1).[17]  Eastern's Bill of Lading Clauses
14 and 25 are "special arrangements" intended to alter the formula
for limitation of liability prescribed by Article 13 of 1992 Japan
COGSA.

Tokio Marine contends that both of Eastern's bill of lading
clauses incorporated into its Waybill are null and void under 1992
Japan COGSA, and that no exception applies in this case.  Eastern,
however, argues that two exceptions are present that give effect
to its more stringent liability clauses: (1) 1992 Japan COGSA's

---

[17] It is Article 13 that is relevant here.  A carrier may not
make a special agreement not in favor of the shipper that is
contrary to the limitation in Article 13.

exception in Article 18 for goods carried on deck; and (2) 1992 Japan COGSA's exception in Article 16 for charter party agreements.

    1.   <u>Goods on Deck</u>

    Article 18 of 1992 Japan COGSA provides:

> (1) The provisions of paragraph (1) of Article 15 shall not apply to the carriage of live animals and cargo carried on deck.
>
> (2) Where a special agreement under paragraph (1) of Article 15 has been made in respect of the carriage stipulated in the preceding paragraph but not inserted into the bill of lading, the carrier cannot set up such special arrangement against a holder of the bill of lading. *A comparable rule shall also apply in the case where the goods are carried on deck and the fact is not inserted into the bill of lading*.

1992 Japan COGSA, Article 18 (emphasis added).

    Here, the goods were carried on deck, and therefore the parties could make a valid special limitation agreement with respect to their carriage. The dispute is whether "the fact [of on deck carriage was] inserted into the bill of lading," as required by Article 18(2). As previously observed, the agreements of Eastern and Mitsubishi are reflected in three documents: (1) the Master Booking Note, (2) the Individual Booking Note, and (3) the Waybill.[18] Of these, only the Individual Booking Note mentions on-deck carriage: "Cargo to be stowed on deck with Merchant risk and

---

[18] *See* Document No. 48 at 8.

responsibility."[19]  The Waybill, however, which Eastern later issued
when it acknowledged receipt of the goods onboard the vessel on
February 8, 2009, was silent as to any on-deck carriage.  This
becomes important because of specific language Eastern did include
in the Waybill, namely, that the Waybill superseded "all agreements
or freight engagements" for carriage of the goods.  The Waybill
states:

> In accepting this Waybill, the Shipper agrees to be bound
> by all the stipulations, exceptions, terms and conditions
> on the face and back of this Waybill and the applicable
> Bill of Lading as referred to in the above, whether
> written, typed, stamped, or printed, as fully as if
> signed by the Shipper, any local custom or privilege to
> the contrary notwithstanding, and *agrees that all
> agreements or freight engagements for and in connection
> with the carriage of the Goods are superseded by this
> Waybill*.

Document No. 42, ex. 4B (Eastern Waybill) (emphasis added).

Interpreting a contract by its plain terms is a basic tenet of
Japanese law.[20]  Respected Japanese counsel has rendered his expert
opinion that "a Japanese court correctly interpreting the Waybill
would conclude as a matter of law that, upon its issuance by
[Eastern], the Waybill constituted the only contract of carriage
for the wind turbine tower cargo because it superseded the terms

---

[19] Document No. 42, ex. 4C, line 21 (Individual Booking Note).

[20] *See* Document No. 48, ex. A ¶ 22.

12

and conditions of its Master Booking Note and Booking Note No. BN011009."[21]

Consistent analogies are found in American law to the extent that there is no direct Japanese judicial authority. The Fifth Circuit has held that a bill of lading supersedes the earlier booking notes or other agreements of the parties when the shipper is the party seeking to enforce the superseding clause in a contract of carriage. *See* W. India Indus., Inc. v. Tradex, 664 F.2d 946, 949 (5th Cir. 1981).[22] In Tradex, the bill of lading stated a lower freight rate (which was mistakenly calculated on the basis of weight rather than by volume) than the rate to which the parties had agreed in an earlier contract. Id. at 948. The bill of lading in that case "represented the controlling agreement between the parties" and superseded the earlier contract. Id. at 949 (citing Universal Am. Corp. v. S.S. Hoegh Drake, 264 F. Supp. 747, 751-52 (S.D.N.Y. 1966)). "Parties may, therefore, after they have formed a contract for carriage, assent to different terms contained in a bill of lading, and 'thereby ma[k]e a new and

---

[21] Id.

[22] Tradex involved a bill of lading. Although a "bill of lading," unlike a waybill, is negotiable, it is still--like a waybill--a contract of carriage for the transportation of goods. *See* Tradex, 664 F.2d at 949 (observing that a bill of lading is an acknowledgment by a carrier that it has received the goods for shipment and is also a contract of carriage, and "serves this function whether negotiable or not"). A waybill serves that same function.

different contract.'"  Id. at 949-50 (quoting N. Pac. Ry. v. Am. Trading Co., 25 S. Ct. 84, 92 (1904)).

Similarly, in Universal American Corp. v. S.S. Hoegh Drake, a bill of lading containing a superseding clause nearly identical to the one at issue in this case was held to be the exclusive contract of carriage.  264 F. Supp. at 748, 752 (S.D.N.Y. 1966).  That bill of lading superseded a previous agreement between the parties which contained an arbitration clause that had been omitted from the bill of lading.  Id. at 751-52.  The arbitration clause was held inapplicable because the bill of lading by its terms "expressly excluded all prior agreements and understandings."  Id. at 752. Further, "[t]he terms of the bill of lading may supersede an earlier term or agreement negotiated between the parties unless it is specifically preserved in the bill of lading."  1 THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW §10-11 at 621 (4th ed. 2004).

Here, the Waybill contains a "superseding" clause nearly identical to those found in Tradex and Universal American.  Tradex, 664 F.2d at 949; Universal Am., 264 F. Supp. at 748-49.  Like Tradex, the shipper/consignee is asserting the superseding clause in its favor against the carrier.  Tradex, 664 F.2d at 951 n.9. Akin to Universal American, a key clause in an earlier contract was deleted from the later superseding contract.  264 F. Supp. at 752. Eastern drafted the Waybill and specified its terms.  As the Waybill unambiguously states that it supersedes all other

14

agreements for carriage of the goods, it replaced the prior booking note as the contract between the parties for the carriage of these wind turbine units.  Id. at 751.

Because no reference to the carriage of goods on deck was inserted into the actual contract of carriage, the exception for special limitation agreements contained in 1992 Japan COGSA Article 18 does not apply.[23]

2.  Contractual Limitation of Liability

Alternatively, Eastern contends that 1992 Japan COGSA Article 15(1) does not apply because part or whole of the vessel itself was subject to a contract of carriage, or charter party.  Eastern relies for this argument on Article 16 of 1992 Japan COGSA:

> The provisions of paragraph (1) of [Article 15] shall not apply to the case where part or whole of a ship is the subject of a contract of carriage.  However, the foregoing is not applicable to the relationship between the carrier and the holder of the bill of lading.

1992 Japan COGSA, Article 16.  Eastern also argues that Tokio Marine is not "the holder of the bill of lading, because the Waybill is not a bill of lading, and hence under 1992 Japan COGSA

---

[23] The Waybill incorporates the Eastern Bill of Lading, of course, but that document limits liability for on-deck carriage only when "goods [are] carried on deck, *and stated herein to be so carried*."  Eastern Bill of Lading Clause 14 (emphasis added).  As observed, Eastern did not so state in its superseding Waybill.

Article 18(2), carriage of goods on deck need not be inserted into that form of contract of carriage.

As noted above, a waybill is a contract for the transportation of goods just as is a bill of lading. *See* Mitsui Sumitomo Ins. Co. Ltd. v. Evergreen Mar. Corp., 621 F.3d 215, 217 n.1 (2d Cir. 2010) ("A waybill typically functions in the same way as a bill of lading, except that it is non-negotiable.  The document serves to acknowledge that the carrier has received the goods, and it operates as a contract for the carriage." (internal citations omitted)); Royal & Sun Alliance Ins., PLC v. Ocean World Lines, Inc., 612 F.3d 138, 141 n.5 (2d Cir. 2010) ("A sea waybill is like a bill of lading, except that bills of lading are negotiable, while waybills are not.").  To be sure, Eastern relied on the Waybill as the contract of carriage, which superseded "all agreements or freight engagements" for carriage of the goods, and by its express terms the goods were to be "carried subject to the terms of Carrier's applicable Bill of Lading."  The Court finds, however, based not only on analogous American law but also upon the expert opinion of respected Japanese counsel,[24] that a Japanese court correctly applying Japanese law to the facts of this case would likely construe the phrase, "a holder of the bill of lading," as used in 1992 Japan COGSA Article 18(2), to include a holder of the Waybill who, just as the holder of a bill of lading, has an

---

[24] Document No. 59, Ex. C, at 4.

16

interest in receiving notice inserted in the superseding Waybill that the goods are being carried on deck and that an Article 15(1) special limitation agreement has been made.  This would be the likely holding of a Japanese Court correctly applying 1992 Japan COGSA even if the holder of the Waybill otherwise knew or specially agreed with Eastern that the cargo was to be carried on deck. "[T]he carrier cannot set up such [a] special agreement . . . if the goods are carried on deck and the fact is not inserted into the bill of lading," which under the facts of this case applies to the Waybill, which was the contract of carriage.  1992 Japan COGSA, Article 18(2).

Turning to Eastern's charter party argument, broadly speaking there are two types of contracts in Japan for the carriage of goods: (1) a contract for the carriage of general cargo, which involves the carriage of one or some specified cargo(es); and (2) a charter party, "in which the carrier reserves the whole or partial space of the ship at the disposal of the other party (charterer) and undertakes to carry whatever cargo loaded onto the chartered space."[25]  The subject matter of the agreement is an indication of the type of contract involved: if the agreement relates to the carriage of *specific goods*, it amounts to a contract of carriage;

_____

[25] Mika Takahashi and Souichirou Kozuka, <u>The Outline of the Japanese Maritime Law, § 2 Carriage of Goods</u>, TRANSPARENCY OF JAPANESE LAW PROJECT, GROUP FOR INTERNATIONAL GOODS AND SERVICES TRANSACTION LAW, http://www.tomeika.jur.kyushu-u.ac.jp/transaction/maritime.html (last visited July 20, 2011).

but if it involves "obligations related to putting the ship at the disposal of the charterer," it constitutes a charter party.[26]  *Cf.* Ins. Co. of N. Am. v. S/S Am. Argosy, 732 F.2d 299, 303 (2d Cir. 1984) ("A charter party is the hiring of the whole or a part of the vessel . . . .").

Here, the subject matter of the booking notes between Eastern and Mitsubishi concerns the transport of specified cargo, specifically, 12 sets of wind turbine sections.  It does not entail reserving part or all of the M/V Sophie Rickmers for whatever cargo might be carried on the vessel.[27]  Moreover, there is no evidence that either party ever intended that the booking notes be construed as charter parties.  The superseding Waybill describes specific goods for carriage as follows:

| Marks & Numbers | No.of pkgs. or Units | Kind of packages; Description of goods | Gross weight lbs. | Measurement cft. |
|---|---|---|---|---|
| | 53 P'KGS | | 2,624,340 KGS | 14,824.38 CBM |
| P'KG NO.: SECTION: TOP/MIDDLE/BOTTOM SIZE(LENGTH,DIA.) DESTINATION: | | 48 PCS & 5 PACKAGES MITSUBISHI WIND TURBINE "TOWER FOR WIND TURBINE GENERATOR" *BOOTS(384EA) AND SHIPPING FIXTURES(96EA) ARE ASSEMBLED WITH TOWER SECTIONS. *ORIGIN: KOREA | | |
| Total Number of packages or units (in words) | | *FREIGHT PREPAID* | | |

---

[26] Caslav Pejovic, The Legal Nature of a Time Charter under Japanese Law - To Be or Not To Be, 54 JAPAN SHIPPING EXCHANGE BULLETIN 10, 15 (March 2009), *available at* http://www.jseinc.org/en/bulletin/issues/Vol.54.pdf (last visited July 20, 2011).

[27] *See* Document No. 42, ex. 4C at line 12.

18

This contract is not a charter party but a contract for carriage of specified cargo.  Hence, Article 16 does not apply.

Because no exception under 1992 Japan COGSA applies, Eastern's "special agreements" in its Bill of Lading further to limit its liability are null and void.  *See* 1992 Japan COGSA Article 15(1). Accordingly, the 1992 Japan COGSA Article 13 statutory limit of liability applies.

IV. <u>Rickmers Defendants' Motion for Partial Summary Judgment</u>[28]

The Rickmers Defendants move for partial summary judgment that their liability is limited by Rickmers GmbH's bill of lading, which they assert incorporates the Hague Rules.  Tokio Marine asserts that the Rickmers Defendants' liability is limited instead by the Hague-Visby rules, or in the alternative, that the Rickmers Defendants did not give Mitsubishi a fair opportunity to opt for a higher liability limitation, and therefore cannot benefit from any contractual limitation of liability.

Rickmers GmbH's bill of lading is in all material respects the identical form of bill of lading that Rickmers GmbH issued to the shipper in <u>Marinor Associates, Inc. v. M/V Panama Express</u>, No. H-08-1868, 2011 WL 710616 (S.D. Tex. Feb. 18, 2011).  In <u>Marinor</u>,

---

[28] Rickmers America's Motion for Summary Judgment, included in Document No. 43 along with Rickmers GmbH's motion, is moot because Rickmers America has been dismissed as a party. *See* Document No. 58.

Rickmers GmbH also moved for partial summary judgment that its liability was limited by the Hague Rules incorporated in its bill of lading.  For the same reasons set forth in detail in the Court's February 18, 2011 Memorandum and Order denying partial summary judgment in <u>Marinor</u>, the Court here again holds that even if the Clause 15(2) of the Rickmers GmbH bill of lading adopts the Hague Rules for above deck carriage, the Rickmers GmbH bill of lading does not contain evidence of Mitsubishi's having been given fair opportunity to have a choice of rates and valuations as required to give effect to that clause.  The Rickmers Defendants have not met their burden to make a *prima facie* showing of fair opportunity.[29]

---

[29] Contrary to the Rickmers Defendants' assertion, <u>Craddock International, Inc. v. W.K.P. Wilson & Son, Inc.</u> does not limit the fair opportunity doctrine only to bills of lading subject to or incorporating all of COGSA.  *See* 116 F.3d 1095, 1106-08 (5th Cir. 1997).  At issue there was potential limitation of an *insurer*'s liability to the *carrier* under an insurance policy's coverage limitation clause, not limitation of the carrier's liability to the shipper.  <u>Id.</u> at 1106.  If the third-party claim against the carrier was for cargo carried under bills of lading "subject or made subject to" COGSA, then the policy coverage was "limited to such as is imposed by said Act."  <u>Id.</u>  If, on the other hand, the cargo was carried under bills of lading "not subject or made subject to" COGSA, then the insurer's liability to the carrier was limited as if the underlying bills of lading included various terms, including a $250 per package or customary freight unit limitation of liability.  <u>Id.</u>

The court specifically noted that "COGSA's fair opportunity doctrine has never been applied to a limitation-of-coverage clause in the marine insurance context," and that it "has been applied to nullify only limitations of liability as between carriers and shippers."  <u>Id.</u> at 1107 n.16.  That is, the policy had to incorporate COGSA--including its fair opportunity doctrine--before the doctrine could be held to apply to nullify the policy's limitation of liability.  The Fifth Circuit held that it did not--

Unlike Marinor, however, the Rickmers Defendants do not rest exclusively on their bill of lading to show evidence of fair opportunity; they also point to Mitsubishi's acquisition of insurance coverage. Although, as the Rickmers Defendants assert, "[c]ourts within this circuit have also found marine cargo insurance to be additional evidence of fair opportunity,"[30] courts typically look to the existence of insurance coverage *after* the carrier has satisfied its *prima facie* burden to show fair opportunity, thereby shifting the burden to the shipper to prove it was denied a fair opportunity. *See, e.g.*, Vision Air Flight Serv. v. M/V Nat'l Pride, 155 F.3d 1165, 1169 (9th Cir. 1998) (after finding that the carrier "made its *prima facie* showing," shifting the burden to the shipper "to prove it was denied such an opportunity," noting that the shipper, "*[h]aving been notified in*

---

the first clause, incorporating COGSA, did not apply because the cargo at issue was not carried under bills of lading "subject or made subject to" COGSA.  *See* id. at 1107.  The alternate limitation of liability did not incorporate COGSA wholesale, but instead only parts of it--not including the fair opportunity doctrine.  *See* id. at 1107-08.

Here, by contrast, the issue is whether a carrier can benefit from a contractual limitation of its liability to a cargo owner. *See* id. at 1107 ("[B]efore a carrier can benefit from COGSA's limitation of liability *or a contractual one*, the cargo owner must be given a 'fair opportunity' to avoid the limitation. . . . The fair opportunity doctrine appears to be unique to the United States' interpretation *of the Hague Rules*." (citations omitted, emphases added)).

[30] Document No. 64 at 9 (citing Propak Sys. Ltd. v. M/V Cecilia I, 1996 A.M.C. 2773, 2795 (S.D. Tex. Feb. 15, 1996) (Lake, J.)).

*the bill of lading that it may opt for higher liability*, . . . declined to declare ad valorem value and pay additional freight" (emphasis added)); <u>Travelers Indem. Co. v. Vessel Sam Houston</u>, 26 F.3d 895, 899-900 (9th Cir. 1994) (after finding that the carrier met its *prima facie* burden, noting that "a shipper who chooses to insure its cargo through an independent insurance company has made a conscious decision not to opt out of COGSA's liability limitation"); <u>St. Paul Fire and Marine Ins. Co. v. Thypin Steel Co.</u>, No. 95 Civ.4439, 1999 WL 639718, at *8 (S.D.N.Y. Aug. 23, 1999) (Mukasey, J.) ("Nevertheless, actual knowledge of the liability limitation [evidenced by insurance coverage] is irrelevant to the Carriers' prima facie case.  Initially, the notice requirement must be satisfied solely on inspection of the bills of lading.").

Even though there are some examples of a carrier introducing marine cargo insurance as evidence to meet its *prima facie* burden, *see, e.g.*, <u>Propak Sys. Ltd. v. M/V Cecilia I</u>, 1996 A.M.C. 2773, 2794-95 (S.D. Tex. Feb. 15, 1996) (Lake, J.) (citing <u>Granite State Ins. Co. v. M/V Caraibe</u>, 825 F. Supp. 1113, 1129 (D.P.R. 1993)), the Rickmers Defendants "do not cite nor has the court found any case relying solely on evidence of marine cargo insurance to sustain the carrier's *prima facie* burden." <u>Id.</u> at 2795; *cf.* <u>M/V Caraibe</u>, 825 F. Supp. at 1128-29 (relying on multiple factors to find that the carrier met its *prima facie* burden, including a

tariff publishing *ad valorem* rates, language in the bill of lading, and the comprehensive nature of the insurance plan, in addition to the existence of insurance coverage).  Indeed, Judge Lake in Propak denied the carrier's motion for summary judgment because of fact issues on fair opportunity despite his consideration of the shipper's marine cargo insurance as part of the carrier's *prima facie* fair opportunity showing.  Id. at 2796-97.[31]

---

[31]  There are numerous inferences to draw from a shipper's acquisition of insurance coverage besides the one advanced by the Rickmers Defendants.  For example, a shipper may simply want to avoid the uncertainties and costs of litigation often necessary to recover for a cargo loss from a carrier.  *See, e.g.*, Stanley L. Gibson, The Myth of Cargo Insurance as Conclusive Evidence of Cargo Owners' Intent to Accept COGSA's $500 Per Package Limitation, 23 U.S.F. Mar. L.J. 81, 91 (2010-2011) ("Probably the most important [reason for obtaining cargo insurance unrelated to a carrier's limitation of liability] is that the cargo owner can make a claim against the cargo insurer immediately after the cargo is lost or damaged and can get money quickly without having to incur the litigation expense of proving the value of the cargo and carrier liability under COGSA.").  A shipper may also want to be covered for losses to its cargo that would *not* be compensable by the carrier regardless of a higher declared value, such as losses for which the carrier has statutory defenses under COGSA (e.g., negligence of the master or crew in managing the ship).  *See* id. at 91; *see also* Folger Coffee Co. v. Olivebank, 201 F.3d 632, 637 (5th Cir. 2000) ("Neglect by management also relieves liability under COGSA.").  Similarly, claims for contribution from cargo owners under the right of salvage and the law of general average may be covered by insurance, but would not give rise to claims against the carrier. Gibson, *supra*, at 94-95. It would therefore be incongruous to hold that insurance, alone, justifies granting the Rickmers Defendants' motion for summary judgment, particularly where reasonable inferences must be "viewed in the light most favorable to the nonmoving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 106 S. Ct. 1348, 1356 (1986).

Accordingly, the Rickmers Defendants have not carried their burden at this stage to show their entitlement as a matter of law to partial summary judgment.

## V.   Order

For the foregoing reasons, it is

ORDERED that Eastern Car Liner, Ltd.'s Motion for Partial Summary Judgment (Document No. 42), and Defendant Rickmer-Linie GmbH & Cie KG's and the Sophie Rickmers' Motion for Partial Summary Judgment (Document No. 43), are both DENIED.

The Clerk will enter this Order, providing a correct copy to all counsel of record.

SIGNED in Houston, Texas, on this 21st day of July, 2011.


_____
EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE